UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

A. BLAIR ENTERPRISES, INC., individually
and on behalf of all others similarly situated,

    Plaintiff,

v.

FORD MOTOR COMPANY,

    Defendant.

Case No.  3:17-CV-436-DJH

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

   1.  Plaintiff A. Blair Enterprises, Inc. ("Blair Enterprises") files this
Complaint and Jury Demand against Defendant Ford Motor Company, individually and on
behalf of all others similarly in Kentucky situated for damages caused by Ford Transit vans
equipped with uniform and uniformly defective driveshaft flexible couplings manufactured,
distributed, warranted, and sold/leased by Ford Motor Company and/or its related subsidiaries or
affiliates (collectively, "Ford"), as further described below.

   2.  The vehicles at issue in this action are 2015-2017 Ford Transit vans (the
"Class Vehicles").

   3.  This action is brought to remedy violations of law in connection with
Ford's design, manufacture, distribution, marketing, advertising, selling/leasing, warranting, and
servicing of the Class Vehicles. These Class Vehicles have a serious defect (the "Defect") that
results in the driveshaft flexible coupling ("flex disc") cracking and ultimately failing, resulting
in damage to the Class Vehicles and presenting a significant safety risk to Vehicle occupants.

   4.  The flex disc is a type of "universal joint" positioned between the engine
(in specific, the transmission) and the driveshaft, and is used to transmit the rotational torque

generated by the engine to the driveshaft, which in turn transmits it to the axles and finally the wheels, propelling the Vehicle.

5. The flex disc is made of flexible rubber material and is designed to allow some angular misalignment while reducing driveline vibration.



6. A triangular flange connecting the flex disc to the transmission is bolted on to one side of the flex disc using three of the holes; a similar triangular flange connecting the flex disc to the driveshaft is bolted on to the other side of the flex disc using the other three holes.

7. When the flex disc fails, it fails catastrophically. The failure causes the driveshaft violently to tear away from the transmission, which can result in severe damage surrounding Vehicle components, including brake and fuel lines, the transmission, rear end differential, torque converter, evaporation container, and other parts, mangling the driveshaft in the process. The damage to these components contributes to a dangerous loss of Vehicle control, including the loss of brakes and engine power. Further, the forward end of the driveshaft disconnecting from the transmission creates the risk that the driveshaft will "catch" on the ground beneath the Vehicle, violently forcing the driveshaft upwards which can pierce into the passenger cabin and cause the Vehicle to "pole vault," i.e. catapult the entire Vehicle into the air.

8. Flex disc failure due to the Defect is not a one-time event in the Class Vehicles; after the flex disc fails, Ford simply replaces it with the same defective part, which does not reduce the safety and failure risks.

9.     Until the Safety Recall issued June 28, 2017, discussed below, when Plaintiff and Class Members complained to Ford about the Defect, Ford disclaimed knowledge or responsibility, blamed driver error, and did not cover the replacement of the failed flex disc or the repair of the collaterally damaged Vehicle components under warranty, forcing Plaintiff and Class Members to spend money to replace the failed flex disc and all other damaged components, to lose the use of their Vehicles, and to lose valuable business opportunities due to the lost time of having the Vehicles out of service while being repaired.

10.     On information and belief, prior to the manufacture and sale of the Vehicles at issue, Ford knew of the Defect through its knowledge of and experience with automotive engineering and pre-release evaluation and testing of the components and vehicles, as well as from sources such as "field data;" replacement part sales data; early customer complaints made directly to Ford, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI"), and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources. Yet despite this knowledge, Ford failed to disclose and actively concealed the Defect from Class Members and the public, and continued to market and advertise the Class Vehicles as "tough," "safe," "durable" vehicles "designed to do its job all day, every day, and for many years to come," which they are not.

11.     On June 28, 2017, Ford issued a Safety Recall for the Flex Disc Defect in the Class Vehicles. The Safety Recall notice stated that "continuing to operate a vehicle with a cracked flexible coupling may cause separation of the driveshaft, resulting in a loss of motive power while driving or unintended vehicle movement in park without the parking brake applied." The Recall also noted that "separation of the driveshaft from the transmission can result in secondary damage to surrounding components, including brake and fuel lines." Ford also acknowledged that "driveshaft separation may increase the risk of injury or crash."

12.     In its Safety Recall notice, Ford requires Class Vehicle owners to replace the flex disc "every 30,000 miles" until a permanent remedy (which Ford admittedly does not

have) becomes available. This aspect of the Safety Recall makes clear that the flex discs fail quickly and repeatedly.

13.     The Safety Recall notice makes clear that Ford presently does not have a permanent fix for the Defect. Moreover, nothing in the terms of the Recall indicates that Ford intends to reimburse Plaintiff and Class Members for the past costs incurred for the replacement of defective flex discs, repair of severe collateral damage to other Vehicle systems caused by the catastrophic failure of the flex discs, lost use of the Class Vehicles and lost business opportunities due to the loss of the Class Vehicle's use during repairs. In short, as the Safety Recall notice makes clear, Ford's Recall fails to fix the underlying problem and falls well short of fully compensating Plaintiff and Class Members for the harm caused by the defective Class Vehicles.

14.     As a result of Ford's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain defective parts, have manifested and continue to manifest the Defect, and Ford has not provided a permanent remedy for this Defect. Furthermore, Plaintiff and Class Members have incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Defect, including replacement parts, repair of other Vehicle systems damaged by the failure of the flex disc, and lost time and business opportunities caused by the time the Vehicles are waiting to be serviced.

15.     Plaintiff brings this action to recover damages and equitable relief from Ford on behalf of itself and all others who purchased or leased the Class Vehicles in Kentucky for purposes other than personal, family, or household use.

## PARTIES

16.     Plaintiff A. Blair Enterprises, Inc., is a small, Kentucky corporation located in Louisville, Kentucky, with a national business transporting parts and other supplies for the automotive industry, among other transportation services.

1357416.5

17.     Defendant Ford Motor Company is a Delaware corporation with its principal place of business in Dearborn, Michigan.

18.     At all times relevant to this Complaint, Ford engaged in the business of designing, manufacturing, distributing, assembling, marketing, warranting, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components in Kentucky and throughout the United States.

**Plaintiff's Experience with the Class Vehicles**

19.     Plaintiff Blair Enterprises owns eleven (11) Class Vehicles, all of which are used by Blair Enterprises for business purposes, and all of which were purchased new at All-State Ford in Louisville, Kentucky.

20.     The VIN numbers and purchase dates for Plaintiff's Class Vehicles are:

| 1 | 1FTBW3XG5FKA38655 | 2/20/2015 |
|---|---|---|
| 2 | 1FTBW3XG5FKA38656 | 2/20/2015 |
| 3 | 1FTBW3XM4FKB09091 | 7/29/2015 |
| 4 | 1FTBW3XM4FKB09088 | 7/30/2015 |
| 5 | 1FTBW3XM0FKB09086 | 7/31/2015 |
| 6 | 1FTBW3XM9FKB09085 | 7/29/2015 |
| 7 | 1FTBW3XM2FKB09090 | 7/29/2015 |
| 8 | 1FTBW3XM6FKB09089 | 8/3/2015 |
| 9 | 1FTBW3XM7FKB09084 | 8/3/2015 |
| 10 | 1FTBW3XM6FKB09092 | 8/3/2015 |
| 11 | 1FTBW3XM2FKB09087 | 8/3/2015 |

21.     On two of Plaintiff's Vehicles, the flex disc failed catastrophically during normal use, causing a safety hazard for the Vehicle drivers and the other nearby cars on the road, and causing extensive collateral damage to the Vehicles themselves, which required expensive

repairs that Plaintiff had to pay for out of pocket, as well as the cost incurred and time and business lost while the Vehicles were out of service being repaired.

22.     Vehicle #2 experienced the catastrophic flex disc failure during normal use on or around October 13, 2016. The flex disc failure caused the driveshaft to fall to the pavement while the Vehicle was traveling on the highway. This destroyed the transmission, fuel tank strap, parking brake cable, and other parts. After being towed to a repair shop, the Vehicle required more than $10,600 worth of repairs. Blair Enterprises lost time and business because the Vehicle was damaged and undriveable, and incurred expenses and costs for the driver to stay on the road while the Vehicle was being repaired.

23.     Vehicle #5 experienced the catastrophic flex disc failure during normal use on or around November 30, 2016. The flex disc failure caused the driveshaft to fall to the pavement while the vehicle was traveling on the highway. This caused tremendous damage, and required replacing the transmission, brake lines, fuel lines, and other parts. After being towed to a repair shop, the Vehicle required more than $10,100 worth of repairs. Blair Enterprises lost time and business because the Vehicle was damaged and undriveable, and incurred expenses and costs for the driver to stay on the road, including hotel costs, while the Vehicle was being repaired.

24.     After these two failures, Blair Enterprises had the flex discs in its nine other Class Vehicles checked by Ford service centers, including at All-State Ford in Louisville, Kentucky. On each Vehicle, the flex discs showed clear signs of incipient failure including cracking and breaking, and Plaintiff therefore had them replaced at an approximate cost of $390 per Vehicle.

25.     In addition, Plaintiff lost business opportunities and time due to its Class Vehicles being out of service due to the Defect. These business opportunities were not speculative, but were based on existing contracts that Blair Enterprises could not now perform under due to its Vehicles being out of service for repairs due to the Defect.

1357416.5

26.     On each occasion, Blair Enterprises sought from Ford Customer
Operations payment for the damage to its Vehicles, but was told that Ford would not pay for the
cost of replacing the flex discs or repairs of collateral damage caused to other Vehicle
components by the flex disc failure. Ford resisted Plaintiff's requests, offering only partial
reimbursement for the repair costs only after persistent argument from Plaintiff through its
President Tom Robertson. Despite Plaintiff's repeated entreaties, Ford would not make Plaintiff
whole and reimburse all the costs it paid out of pocket for replacement flex discs, and repair to
collaterally damaged Vehicle components, or compensate it for the time and business
opportunities it lost due to the Defect. Therefore, any further dispute resolution attempts by
Plaintiff with Ford were futile.

27.     When it purchased its Class Vehicles, Blair Enterprises expected the Class
Vehicles to be of good and merchantable quality and not defective. It had no reason to know of,
or expect, that the Vehicles were equipped with defective flex discs that would catastrophically
and dangerously fail, nor was it aware from any source prior to purchase of the unexpected,
extraordinary, and costly repairs the Defect would cause them to incur or the safety risk posed.
Had it known these facts, it would not have bought its Class Vehicles or would have paid less for
them.

28.     Plaintiff regularly saw advertisements for Ford vehicles during the time
before it purchased its Class Vehicles. Those advertisements influenced the decision to purchase
its Class Vehicles. Had those advertisements or any other Ford materials disclosed to Plaintiff
that the Class Vehicles had defective flex discs, or that it would have to pay for replacements and
collateral damage repairs due to failure of the defective flex discs, Blair Enterprises would not
have purchased its Class Vehicles, or would not have purchased them at the price paid.

## **JURISDICTION**

29.     This Court has federal question jurisdiction over this action under 28
U.S.C. § 1331 because this case includes claims arising under federal law.

1357416.5

30.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and other Class Members are citizens of a different state than Ford.

31.     This Court has personal jurisdiction over Ford because: Ford is authorized to do business in Kentucky; has a registered agent in Kentucky; conducts substantial business in this District, including with Plaintiff; some of the actions giving rise to this complaint took place in this District; has minimum contacts with Kentucky through its automotive plant and other operations, and through Ford's marketing, sale and promotion of its products in Kentucky, including directly to Plaintiff; each of the foregoing are sufficient bases to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## VENUE

32.     Venue in this District is proper under 28 U.S.C. § 1391 because Ford, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, Ford transacts business within the District, and some of the events establishing the claims alleged herein occurred in this District. Plaintiff resides in this District, purchased its Class Vehicles in this District, and Ford has distributed, marketed, advertised, warranted, sold, leased, and serviced the Class Vehicles within this District.

## APPLICABLE LAW

33.     Plaintiff and all Class Members purchased or leased their Class Vehicles in Kentucky, and Plaintiff seeks damages and equitable relief on behalf of itself and all Class Members under Kentucky law.

## FACTUAL ALLEGATIONS

34.     The defective part at issue here is a flex disc[1] used to transmit rotational torque between the driveshaft and the Vehicle transmission.

---

[1] The flex disc is a type of universal joint also known as a "flexible coupling" or a "giubo" (a contraction of "giunto Boschi" – Italian for "Boschi joint").

1357416.5

35.     The flex disc is made from flexible synthetic rubber and is designed to allow some angular misalignment while reducing driveline vibration.

36.     Input (transmission-side) and output (driveshaft-side) flanges are bolted to the flex disc on either side using alternating hole positions, so that the flanges are not connected directly to one another but instead only through the rubber material of the flex disc. The elasticity of the rubber should absorb vibration and flex for alignment. It follows that the flex disc must withstand the Vehicle's full transmitted torque.

37.     The flex discs at issue here begin to show signs of incipient failure, including cracking, early in life, at times before even 30,000 miles of usage.

38.     Ultimately the flex discs fail. When the flex disc fails, it fails catastrophically. The failure causes the driveshaft violently to tear away from the transmission, which can result in severe damage to surrounding Vehicle components, including brake and fuel lines, the transmission, rear end differential, torque converter, evaporation container, and other components, mangling the driveshaft in the process. The damage to these other components contributes to a dangerous loss of Vehicle control, including the loss of brakes and engine power. Further, the forward end of the driveshaft disconnecting from the transmission creates the risk that the driveshaft will "catch" on the ground beneath the Vehicle, violently forcing the driveshaft upwards, which can pierce into the passenger cabin and cause the Vehicle to "pole vault," i.e. catapult the entire Vehicle into the air.

39.     The Flex Disc Defect therefore poses an unreasonable safety risk in that it can cause loss of Vehicle control, increased risk of a crash, and risk of the separated driveshaft piercing the passenger cabin or catapulting the entire Vehicle into the air via a "pole vault" effect when the driveshaft catches on the ground beneath the Vehicle.

A.     **Ford Knew of the Flex Disc Defect Prior to Sale or Lease of the Class Vehicles**

40.     On information and belief, Ford learned of the Flex Disc Defect at least as early as 2014, and certainly well before Plaintiff and Class Members purchased or leased their

Class Vehicles, through sources such as its knowledge of and experience with automotive engineering and pre-release evaluation and testing of the components and vehicles, as well as replacement part sales data; early customer complaints made directly to Ford, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiff prior to discovery.

41.     In its Recall notice, Ford noted that it relied on "field data" in issuing the Recall. This "field data" also would have given Ford knowledge of the Defect prior to the issuance of the Recall.

1.     **Ford's Knowledge of the Flex Disc Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data**

42.     During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Ford necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicle's flex discs:  the types and properties of materials used to make the parts, including their durability and whether those materials would weaken over time regardless of wear and use; the basic engineering principles behind the construction and function of the parts; the forces and stresses the parts would face; when and how the parts would fail; and the cumulative and specific impacts on the parts caused by wear and use, the passage of time, and environmental factors.

43.     An adequate pre-release analysis of the design, engineering, and manufacture of the flex discs used for the Class Vehicles would have revealed to Ford that the flex discs were insufficiently strong and durable for the intended use, would likely not last even 30,000 miles, let alone the useful life of the vehicle, even under less-than-normal use. Thus during the pre-release design stage of the Class Vehicles, Ford knew or should have known that the flex disc it chose for the Class Vehicles was defective and would pose a safety risk to owners/lessees and the motoring public.

2. **Ford's Knowledge of the Flex Disc Defect Gathered from the Large Number of Replacement Flex Discs Bought from Ford**

44.     On information and belief, Ford also knew or should have known about the Flex Disc Defect because of the higher than expected number of replacement flex discs ordered from Ford, which should have alerted Ford that this was a defective part.

45.     On information and belief, Ford service centers use Ford replacement parts that they order directly from Ford. Therefore, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement flex discs. The ongoing high sales of replacement flex discs was (or should have been) known to Ford, and alerted Ford that its flex discs were defective and posed a safety risk.

3. **Ford's Knowledge of the Flex Disc Defect Gained from Class Member Complaints Made Directly to Ford**

46.     Ford also knew or should have known about the Flex Disc Defect because numerous customer complaints regarding catastrophic failures of the flex discs were made directly to Ford. The large number of complaints, and the consistency of their descriptions of the Flex Disc Defect and the catastrophic failures, safety risk, and collateral damage it caused in the Class Vehicles alerted Ford to this serious Defect affecting the Class Vehicles.

47.     The full universe of complaints made directly to Ford about the Flex Disc Defect is information presently in the exclusive custody and control of Ford and is not yet available to Plaintiff prior to discovery. However, upon information and belief, many Class Members complained directly to Ford and Ford dealerships and service centers about the repeated flex disc failures their Vehicles experienced.

48.     Plaintiff itself complained vocally and repeatedly to Ford. Beginning on the date of its first flex disc failure, in October 2016, Plaintiff repeatedly and consistently communicated with Ford service centers and Ford Customer Operations concerning its dissatisfaction and safety concerns regarding the flex disc failures and Flex Disc Defect.

1357416.5

49.     Other instances of these direct-to-Ford complaints by Class Members are described in Class Vehicle owners' complaints logged with NHTSA ODI and posted on online vehicle owner forums:[2]

- "The contact owns a 2015 Ford Transit.  While driving on the highway, the contact lost control of the vehicle.  The vehicle was towed to the dealer where it was diagnosed that the driveshaft fractured and damaged the transmission.  In addition, the technician stated that the driveshaft wrapped around the brake line.  The technician stated that all the brake lines, the transmission, the rear end differential, and the driveshaft needed to be replaced.  The vehicle was repaired.  **The manufacturer was notified**."  Complaint in NHTSA ODI database, ODI ID No. 10935896, date of incident: June 29, 2016 (emphasis added).

- "The contact owns a 2015 Ford Transit.  The contact stated that while driving at 70 mph, the driveshaft fractured and caused damage to the torque converter and the brake lines.  The vehicle was taken to the dealer to be repaired. The contact stated that the dealer replaced the transmission, the torque converter and also the brake lines were replaced.  The vehicle was repaired.  The **manufacturer was notified of the failure**."  Complaint in NHTSA ODI database, ODI ID No. 10935016, date of incident: June 29, 2016 (emphasis added).

50.     As the above sampling of complaints shows, Class Members have been vocal in complaining directly to Ford about the Flex Disc Defect, and the number and consistency of their complaints should have alerted Ford about the Flex Disc Defect.

---

[2] For these and other customer complaints quoted in this Complaint, quotes are left as written, except that those originally in all-caps have been changed to sentence case. Due to the sheer number of typographical and grammatical errors, [sic] notation has not been used. Any emphasis has been added, unless otherwise noted.

1357416.5

**4.      Ford's Knowledge of the Flex Disc Defect from Class Member Complaints Collected by NHTSA's Office of Defect Investigations**

51.      In addition to complaints made directly to Ford, many Class Vehicle owners and lessees lodged complaints about the Flex Disc Defect with NHTSA ODI, beginning as early as 2014, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles.

52.      Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

53.      Thus automakers should (and do) monitor NHTSA databases for customer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, especially safety-related defects such as the Flex Disc Defect.

54.      From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about catastrophic flex disc failures logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford to the Flex Disc Defect.

55.      A sampling of the publicly available complaints lodged with NHTSA ODI includes those quoted above, as well as the following:

- "62 mph on cruz hwy 501 the [flex disc] on the back of the transmission snapped - the drive shaft was free spinning, ripping brake lines out, and killing the motor.  Was able to stop using parking brake.  **This is the third truck in my terminal this has happened to - it is only a matter of time before someone gets hurt**."  Complaint in NHTSA ODI database, ODI ID No. 10914351, date of incident: August 11, 2016 (emphasis added).

- "Ford Transit with was going down a straight four lane highway at 65 miles per hour when without warning the [flex disc] on the drive shaft came apart.  Driver heard

what sounded like a small explosion.  The brake lines were blown off, the fuel line was damaged, the drive shaft was broken, and a hole was blown into the transmission case. Driver had no brakes, the drive shaft was separated from the rear wheels, and transmission could not be down shifted.  Engine remained on and she was able to steer. There was no traffic near her or around her at the time. Road was straight.  Driver put hand on emergency brake in case someone pulled in front of her and coast[ed] two miles to a stop."  Complaint in NHTSA ODI database, ODI ID No. 10926224, date of incident: October 31, 2016.

- "Flex coupling between transmission and drive shaft routinely fails between 30,000 - 35,000 miles.  This can create a dangerous situation where the drive shaft could be forced into the passenger compartment when it comes into contact with the road. Additionally, the failure of the flex coupling could cause loss of control of the vehicle. There are numerous reports of these failures on Ford vehicle forums as well as the failure that I have personally experienced.  After reading of the numerous failures, I inspected the flex coupling on my vehicle at 30,000 miles and found that the flex coupling had visible cracks.  **A failure of a drive line component, which could cause great bodily harm, at 30,000 miles, is unacceptable in a modern vehicle**."  Complaint in NHTSA ODI database, ODI ID No. 10981385, date of incident: April 24, 2017 (emphasis added).

56.     As the above sampling of complaints makes clear, Class Members have been vocal in complaining to NHTSA ODI about the Flex Disc Defect since at least 2014, and Ford was, or should have been, aware of and monitoring those complaints, and thus should have known about the Flex Disc Defect and related safety risk since at least 2014, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles.

57.     In sum, as early as 2014, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, Ford was aware of the Flex Disc Defect, should have been aware of the Flex Disc Defect through the exercise of reasonable care, and/or

was negligent in failing to be aware of the Flex Disc Defect, based on, among others, the following sources:

> a.    Pre-release design, manufacture, engineering, and testing data;

> b.    "Field data" referred to in the Safety Recall notice, which was necessarily known to Ford prior to its issuance of the Safety Recall;

> c.    Knowledge Ford had of the large number of replacement flex discs ordered from Ford;

> d.    Numerous and consistent customer complaints made directly to Ford about the Flex Disc Defect; and

> e.    Numerous and consistent customer complaints collected by NHTSA ODI about the Flex Disc Defect.

58.    Moreover, the large number and consistency of Class Member complaints describing the Flex Disc Defect underscores the fact that Class Members considered the Flex Disc Defect to be a safety risk and a material issue to the reasonable buyer or lessee.

### B.    **Applicable Warranties**

59.    Ford sold and leased Class Vehicles with a written express warranty.

60.    Ford's new vehicle Limited Warranty specifically provides for extended (five-year, 60,000-mile) coverage for certain Vehicle components and parts, including "universal and constant velocity joints" (which includes the flex discs).

61.    Ford replacement parts sold through authorized Ford dealerships or Ford-authorized distributors are covered by a two-year, unlimited mileage Service Parts Warranty.

62.    Ford provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of these warranties.

63.    Plaintiff was not provided with these warranties prior to purchasing the Class Vehicles or replacement flex discs.

1357416.5

64.     Ford issues these warranties directly to buyers and lessees, and so the warranties create a direct contractual relationship between Ford and the buyers/lessees of Class Vehicles, including Plaintiff and Class Members.

65.     The warranties contain unexpected and unbargained-for limitations that would (and did) surprise Plaintiff and Class Members upon learning of them.

66.     The warranties do not indicate that buyers or lessees who are dissatisfied with the warranty terms after receiving and reviewing them post-sale may return the Vehicle or replacement parts within a certain time period.

67.     Based on Plaintiff's experiences and reports from other Class Members, prior to the Recall, Ford refused to cover the nonpermanent "fixes" (replacing defective flex discs with same defective part) under warranty, and instead required Class Members pay out of pocket for these nonpermanent "fixes" even if Class Members' Vehicles remained under warranty at the time.

68.     Moreover, both before and after the Recall, Ford refused to cover repairs to the Vehicle components collaterally damaged by the catastrophically failing flex discs.

C.     **The June 28, 2017, Safety Recall**

69.     On June 28, 2017, Ford issued a Safety Recall for the Flex Disc Defect in the Class Vehicles. The Safety Recall does not adequately make Plaintiff and Class Members whole, and does not permanently remedy the Defect.

70.     Nothing in the terms of the Recall indicates that Ford intends to reimburse Plaintiff and Class Members for the past costs they incurred for the replacement of defective flex discs and repair of severe collateral damage to other Vehicle systems caused by the catastrophic failure of the flex discs, lost use of the Class Vehicles and lost business opportunities due to the loss of the Class Vehicle's use during repairs.

71.     Further, in the Safety Recall notice, Ford requires Class Vehicle owners/lessees to replace the flex disc "every 30,000 miles" – indefinitely – until a permanent remedy (which Ford admittedly does not have) becomes available. This promises to create future

-16-

inconvenience, expense, and lost time and business for Plaintiff and Class Members who will have to bring their Vehicles in repeatedly to have the flex discs replaced, with their Vehicles out of service while the replacement parts are ordered and installed.

72.    In short, as the Safety Recall notice makes clear, Ford's Recall fails to fix the underlying problem and falls well short of fully compensating Plaintiff and Class Members for the harm caused by the defective Class Vehicles.

### D.    Ford's Marketing of the Class Vehicles and Concealment of the Defect

73.    On information and belief, Ford knowingly manufactured and sold/leased the Class Vehicles with the Flex Disc Defect, while willfully concealing the true inferior quality, safety risk, and sub-standard performance of the Class Vehicles.

74.    Ford directly markets the Class Vehicles via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

75.    Ford's marketing material describes the Class Vehicles as "durable," "tough," able to "tow and haul heavy cargo," "built to carry lots of people, lots of cargo, or both," is suitable for "running a small business," and notes that "safety takes priority in every Transit" Vehicle.

76.    Ford concealed the fact that the Class Vehicles, which Ford represents are safe and reliable and able to "carry loads that others would have to leave behind," are instead not even safe or reliable under ordinary conditions because the flex discs fail repeatedly, causing a safety hazard and causing collateral damage to other Vehicle components.

77.    Plaintiff and Class Members were exposed to Ford's long-term, national, multimedia marketing campaign touting the safety and durability of the Class Vehicles, and Plaintiff and Class Members justifiably made their decisions to purchase/lease their Class Vehicles based on Ford's misleading marketing that concealed the true, defective nature of the Class Vehicles.

78.     Further, Ford knowingly misled Plaintiff and Class Members about the true, defective nature of the Class Vehicles. As detailed above, upon information and belief, Ford has been aware of the Flex Disc Defect since at least 2014, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing, "field data", the high number of flex disc replacement part sales, and the numerous and consistent complaints about the Flex Disc Defect made directly to Ford, collected by NHTSA, and posted in public online forums.

79.     Despite Ford's knowledge of the Defect, until the Recall Ford told Class Members who complained to it about the Flex Disc Defect that Ford had never heard of the problem before and that the failures were due to driver error.

80.     In sum, Ford actively concealed the existence and nature of the Flex Disc Defect from Plaintiff and Class Members from at least 2014 until the Recall, despite its knowledge of the existence and pervasiveness of the Flex Disc Defect, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles. Specifically, Ford has:

a.     Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Flex Disc Defect;

b.     Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles were defective and not fit for their intended purposes;

c.     Failed to disclose, and actively concealed, the fact that the Class Vehicles were defective, despite the fact that Ford learned of the Flex Disc Defect as early as 2014, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles;

d.     Failed to disclose, and actively concealed, the existence and pervasiveness of the Defect even when directly asked about it by Class Members

during communications with Ford, Ford Customer Care, Ford dealerships, and Ford service centers;

        e.      Actively concealed the Defect by forcing Class Members to bear the cost of temporary "fixes" of replacing the flex discs, even though Class Members were led to believe that the flex disc replacement had cured the problem in their Vehicles; and

        f.      Actively concealed the Defect by knowingly selling and installing replacement flex discs in Class Members' vehicles, while knowing and concealing that the replacements would likely soon fail due to the Defect, and that by not providing a permanent remedy, Ford was forcing Class Members to repeatedly repair their Class Vehicles.

        81.      By engaging in the conduct described above, Ford actively concealed the Defect from Plaintiff and Class Members up until it announced the Recall on June 28, 2017. If Plaintiff and Class Members had had knowledge of the information Ford concealed, they would not have purchased/leased the Class Vehicles or would have paid less to do so.

### E.    **Fraudulent Concealment Allegations**

        82.      Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Ford responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. Ford necessarily is in possession of all of this information. Plaintiff's claims arise out of Ford's fraudulent concealment of the Defect and the catastrophic failure, collateral damage, and safety hazard it causes. To the extent that Plaintiff's claims arise from Ford's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases its claims. Plaintiff alleges that at all relevant times, including specifically at the time it purchased its Class Vehicles, Ford knew, or was reckless in not knowing, of the Defect; Ford was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its

concealment of it; and Ford never disclosed the Defect to Plaintiff or the public at any time or place or in any manner until the Recall.

83.     Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

a.     **Who:** Ford actively concealed the Defect from Plaintiff and Class Members while simultaneously touting the safety and durability of the Class Vehicles, as alleged above. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Ford responsible for such decisions.

b.     **What:** Ford knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged above. Ford concealed the Defect while making representations about the safety, durability, and other attributes of the Class Vehicles, as specified above.

c.     **When:** Ford concealed material information regarding the Defect at all times and made representations about the  safety and durability of the Class Vehicles, starting no later than 2014, continuing through the time of sale/lease, and on an ongoing basis, until the announcement of the Recall on June 28, 2017, as alleged above. And when Plaintiff and Class Members brought their Vehicles to Ford complaining of the Defect, Ford denied any knowledge of or responsibility for the Defect, and in many instances, actually blamed the customer for causing the problem.

d.     **Where:** Ford concealed material information regarding the true nature of the Defect in every communication it had with Plaintiff and Class Members and made representations about the safety and durability of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the Defect in the Class Vehicles to anyone outside of Ford, until the Recall was announced. Such information is not

1357416.5

adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Ford's website.

e.      **How**: Ford concealed the Defect from Plaintiff and Class Members while making representations about the safety and durability of the Class Vehicles. Ford actively concealed the truth about the existence and nature of the Defect from Plaintiff and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable buyer or lessee and Ford promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.      **Why**: Ford actively concealed material information about the Defect in Class Vehicles while making representations about their safety and durability for the purpose of inducing Plaintiff and Class Members to purchase or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles. Had Ford disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff and Class Members (and reasonable buyers or lessees) would have been aware of it, and would not have bought/leased the Class Vehicles or would have paid less for them.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Fraudulent Concealment Tolling

84.      Upon information and belief, Ford has known of the Flex Disc Defect in the Class Vehicles since at least 2014, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Flex Disc Defect, even when directly asked about it by Class Members during communications with Ford, Ford Customer Care, Ford dealerships, and Ford service centers, until the Recall was announced.

85.      Any applicable statute of limitation has therefore been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein.

1357416.5

## B.    Estoppel

86.    Ford was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. Ford actively concealed the true character, quality, and nature of the Class Vehicles and knowingly made representations about the safety, quality, durability, reliability, toughness, and ruggedness of the Class Vehicles. Plaintiff and Class Members reasonably relied on Ford's knowing misrepresentations and active concealment of the Defect. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

## C.    Discovery Rule

87.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles had the Flex Disc Defect.

88.    However, Plaintiff and Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Flex Disc Defect manifested in their Vehicles. Even then, Plaintiff and Class Members had no reason to know the flex disc failure was caused by a defect in the Class Vehicles because of Ford's active concealment of the Flex Disc Defect. Not only did Ford fail to notify Plaintiff or Class Members about the Flex Disc Defect, but up until the Recall Ford in fact denied any knowledge of or responsibility for the Flex Disc Defect when directly asked about it. Thus Plaintiff and Class Members were not reasonably able to discover the Flex Disc Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Flex Disc Defect caused their Vehicles' flex disc failures.

## CLASS ACTION ALLEGATIONS

89.    Plaintiff brings this lawsuit as a class action on behalf of itself and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

1357416.5

90.     Plaintiff brings this class action, including all causes of action stated below, on behalf of itself and all other similarly situated members of the proposed Class defined as follows:

> All persons or entities that purchased or leased a 2015-2017 Ford Transit in Kentucky for purposes other than personal, family, or household use.

91.     Excluded from the proposed Class are: (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**Numerosity**

92.     Although the exact number of Class Members is uncertain, Ford's own Safety Recall notice put the number at over 400,000 Transit Vans in North America, which implies the number of Class Vehicles here is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

**Typicality**

93.     Plaintiff's claims are typical of the claims of Class Members in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, distributed, marketed, and warranted by Ford. Plaintiff, like all Class Members, has been damaged by Ford's misconduct in that it purchased/leased a defective Vehicle it would not have purchased/leased, or would not have purchased/leased at the price paid; incurred or will incur the cost of replacements and repairs relating to and caused by the Defect; and lost time and business

-23-

1357416.5

opportunities due to having Vehicles out of service due to the Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

## Adequacy

94.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting class actions, including actions involving defective vehicles.

95.     Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor its counsel has interests adverse to those of Class Members.

## Predominance of Common Questions

96.     There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.     whether the flex disc in the Class Vehicles is defective;

b.     whether the Flex Disc Defect constitutes an unreasonable safety risk;

c.     whether Ford knew or should have known about the Flex Disc Defect, and, if yes, how long Ford has known of the Defect;

d.     whether the defective nature of the Class Vehicles constitutes a material fact reasonable buyers or lessees would have considered in deciding whether to purchase or lease a Class Vehicle;

e.     whether Ford had a duty to disclose the defective nature of the Class Vehicles to Plaintiff and Class Members;

f.     whether Ford omitted and failed to disclose material facts about the Class Vehicles;

g.      whether Ford's concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

h.      whether Ford's misrepresentations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent;

i.      whether Ford's misrepresentations and omissions about the true defective nature of the Class Vehicles were and are unfair;

j.      whether Ford represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

k.      whether Ford represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

l.      whether Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised;

m.      whether Ford's misrepresentations and omissions about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding;

n.      whether Ford's misrepresentations and omissions about the true defective nature of the Class Vehicles were and are deceptive;

o.      whether Ford breached its express warranties;

p.      whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

q.      whether Plaintiff and Class Members are entitled to a declaratory judgment stating that the flex discs in Class Vehicles are defective and/or not merchantable;

-25-

       r.      whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

       s.      whether Ford should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Flex Disc Defect in the Class Vehicles; and

       t.      whether Ford is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective flex discs and collateral damage to other Vehicle components caused by the Defect.

### Superiority

97.     Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

98.     Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy.

99.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### FIRST CAUSE OF ACTION

### (Breach of Express Warranty)

1357416.5

100.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kentucky Rev. Stat. §§ 355.2-105(1) and 355.2A-103(h).

101.   Ford is and was at all relevant times a "seller" and "merchant" with respect to the Class Vehicles under Kentucky Rev. Stat. §§ 355.2-103 and 355.2-104, and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Kentucky Rev. Stat. § 355.2A-103.

102.   Plaintiff and Class Members are "buyers" or "lessees" within the meaning of Kentucky Rev. Stat. §§ 355.2-103(1) and 355.2A-103(n).

103.   Plaintiff and Class Members bought or leased Class Vehicles manufactured, marketed to them, warranted, and intended to be purchased by buyers or lessees such as them, by Ford, and are in privity with Ford through their purchases.

104.   Plaintiff and Class Members have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Plaintiff and Class Members and Ford. Further, the written, express warranties issued by Ford with buyers/lessees of the Class Vehicles as its intended beneficiaries create a direct contractual relationship between Ford and Plaintiff and Class Members.

105.   Further, Plaintiff and Class Members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate buyers or lessees of the Class Vehicles and have no rights under the warranties provided with the Class Vehicles; the warranties were designed for and intended to benefit the ultimate buyers and lessees only. Moreover, privity is not required where a manufacturer makes representations directly to intended buyers and lessees, as Ford did here.

106.   Ford expressly warranted the Class Vehicles against defects including the Flex Disc Defect, as described above, within the meaning of Kentucky Rev. Stat. §§ 355.2-313 and 355.2A-210.

107.     As described above, the flex discs in the Class Vehicles are defective. The Flex Disc Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable buyers and lessees, including Plaintiff and Class Members.

108.     Ford knew of the Defect, and that the Defect posed serious safety risks to buyers and lessees like Plaintiff and Class Members, when it expressly warranted against the Defect, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

109.     Ford is obligated, under the terms of its express warranties, to repair permanently and/or to replace the defective flex discs for Plaintiff and Class Members within a reasonable amount of time; that is, Ford is obligated to provide Plaintiff and Class Members with nondefective Class Vehicles that are not equipped with defective flex discs.

110.     Ford breached its express warranties by knowingly supplying the Class Vehicles to Plaintiff and Class Members with defective flex discs; by concealing from and failing to disclose to Plaintiff and Class Members the existence of the Defect during the warranty period, thereby depriving Plaintiff and Class Members of the opportunity to seek to have the Defect remedied during the warranty period; by failing to permanently repair the Class Vehicles under warranty; and by failing to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that Ford promised when it marketed and sold the Class Vehicles to Plaintiff and Class Members.

111.     As more fully detailed above, Ford was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff.

112.     Plaintiff has given Ford a reasonable opportunity to cure its failures with respect to its warranties, and Ford has failed to do so.

113.     Affording Ford any further opportunity to cure its breach of written warranties is unnecessary and futile here.

114.    Ford's express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiff and Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

115.    Accordingly, recovery by Plaintiff and Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

116.    In its capacity as a warrantor, and by the conduct described herein, any attempt by Ford to limit or disclaim the express warranties in a manner that would exclude coverage of the Flex Disc Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by Ford's concealment of material facts. Thus any such effort by Ford to disclaim, or otherwise limit, its liability for the Flex Disc Defect is null and void.

117.    Moreover, it is unconscionable for Ford, having breached its duties under its express written warranties, to attempt to hide behind any provision making its express warranty the sole remedy available to Plaintiff and Class Members.

118.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and have suffered damages in an amount to be determined at trial.

119.    Plaintiff and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### (Breach of Express Warranty – Magnuson-Moss Warranty Act)

120.    Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

121.    The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

1357416.5

122.     Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

123.     Ford is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

124.     Ford provided Plaintiff and Class Members with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

125.     Ford has breached its warranties by refusing to honor the express warranty to replace or repair, free of charge, any defective Vehicle component, including the defective flex discs and the other Vehicle components collaterally damaged by flex disc failure; and/or by concealing from and failing to disclose to Plaintiff and Class Members the existence of the Defect during the warranty period, thereby depriving Plaintiff and Class Members of the opportunity to seek to have the Defect remedied during the warranty period.

126.     At the time Class Vehicles were sold or leased, Ford knew that they possessed the Flex Disc Defect and yet offered express warranties with no intention of honoring them with respect to the known Defect, and concealed from Plaintiff and Class Members the existence of the Defect during the warranty period and afterwards, up until the Recall.

127.     Additionally, pursuant to 15 U.S.C. § 2304(d)(1), "the warrantor may not assess the consumer for any costs the warrantor or his representatives incur in connection with the required remedy of a warranted product . . . [I]f any incidental expenses are incurred because the remedy is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor."

128.     At no time has Ford offered an adequate repair or replacement of the defective flex discs that would permanently avoid repeated catastrophic failure.  Despite repeated demands by Plaintiff and Class Members that Ford pay the costs and incidental expenses associated with replacing defective, failed flex discs and repairing other Vehicle components

-30-

collaterally damaged by flex disc failure, Ford has refused to do so. Ford's refusal to provide an adequate, permanent remedy for the Defect violates 15 U.S.C. § 2304(d)(1).

129.    Ford was afforded a reasonable opportunity to cure its breach of its express warranties, but refused to do so.  Given Ford's refusals to compensate Plaintiff fully for the harm Ford caused, any additional pre-filing dispute resolution efforts would have been futile.

130.    Under 15 U.S.C. § 2310(e), notice of breach of warranty need not be provided until after Plaintiff has been appointed Class Representative. Nevertheless, Plaintiff has provided adequate notice to Ford, as described above.

131.    As a direct and proximate result of Ford's breach of its express written warranties, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Breach of Implied Warranty)

132.    Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

133.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kentucky Rev. Stat. §§ 355.2-105(1) and 355.2A-103(h).

134.    Ford is and was at all relevant times a "seller" and "merchant" with respect to the Class Vehicles under Kentucky Rev. Stat. §§ 355.2-103 and 355.2-104, and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Kentucky Rev. Stat. § 355.2A-103.

135.    Plaintiff and Class Members are "buyers" or "lessees" within the meaning of Kentucky Rev. Stat. §§ 355.2-103(1) and 355.2A-103(n).

136.    Plaintiff and Class Members bought or leased Class Vehicles manufactured, marketed to them, warranted, and intended to be purchased by buyers or lessees such as them, by Ford, and are in privity with Ford through their purchases.

137.    Plaintiff and Class Members have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Plaintiff and Class

1357416.5

Members and Ford. Further, the written, express warranties issued by Ford with buyers/lessees of the Class Vehicles as its intended beneficiaries create a direct contractual relationship between Ford and Plaintiff and Class Members.

138.    Further, Plaintiff and Class Members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate buyers or lessees of the Class Vehicles and have no rights under the warranties provided with the Class Vehicles; the warranties were designed for and intended to benefit the ultimate buyers and lessees only. Moreover, privity is not required where a manufacturer makes representations directly to intended buyers and lessees, as Ford did here.

139.    When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Kentucky Rev. Stat. §§ 355.2-314 and 355.2A-212.

140.    Class Members who purchased or leased a Class Vehicle from Ford are entitled to the benefit of their bargain: a Vehicle that is safe and reliable to drive, and that was not equipped with defective flex discs.

141.    Ford breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

142.    Because of the Flex Disc Defect and the safety hazard it poses, the Class Vehicles do not possess even the most basic degree of fitness for ordinary use, and have been unmerchantable since the time of their sale/lease to Plaintiff and Class Members.

143.    Moreover, because of the Flex Disc Defect the Class Vehicles would not pass without objection in the trade.

144.    Had the Flex Disc Defect that existed at the time of sale/lease been known, the Class Vehicles could not have been sold or leased, or could not have been sold or leased at the same price.

145.    Any attempt by Ford to disclaim the implied warranty of merchantability is unenforceable and unconscionable because it does not meet the requirements of Kentucky Rev. Stat. § 355.2-316(2).

146.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

### (Breach of Implied Warranty – Magnuson-Moss Warranty Act)

147.    Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

148.    Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

149.    Ford is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

150.    The subject Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

151.    Ford extended an implied warranty to Plaintiff and Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers defects in its Class Vehicles.

152.    Ford breached this implied warranty by selling/leasing Class Vehicles that were neither merchantable nor fit for their intended purpose.

153.    Ford extended an implied warranty to Plaintiff and Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers defects in the subject Class Vehicles' flex discs.

154.    Ford breached this implied warranty by selling/leasing Class Vehicles with defective flex discs that were neither merchantable nor fit for their intended purpose.

1357416.5

155.    Under 15 U.S.C. § 2310(e), notice of breach of warranty need not be provided until after Plaintiff has been appointed Class Representative. Nevertheless, Plaintiff has provided adequate notice to Ford, as described above.

156.    As a direct and proximate result of Ford's breach of the implied warranty under the Magnuson-Moss Act, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Fraud by Concealment)

157.    Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

158.    Plaintiff brings this cause of action for itself and on behalf of Class Members.

159.    Ford concealed and suppressed material facts concerning the safety, durability, and quality of the Class Vehicles, specifically the existence of a serious defect causing Class Vehicles' flex discs to catastrophically fail, causing the driveshaft to separate from the engine and the collateral damage of other Vehicle components.

160.    Ford knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles.

161.    Ford furthered and relied upon this lack of disclosure to further promote payments of replacements and repairs and in some cases accused Plaintiff and Class Members of causing the problem – all the while concealing the true nature of cause and Defect from Plaintiff and Class Members. Ford further denied the very existence the Defect when Plaintiff and Class Members complained of the Defect, up until the Recall.

162.    Ford concealed and suppressed material facts that point to the nature of the Defect being a defective flex disc, and instead pushed a temporary "fix" consisting of replacing cracked and failed flex discs with the same defective part, which would also ultimately catastrophically fail.

1357416.5

163.    Ford did so in order to boost confidence in its Vehicles and falsely assure purchasers and lessees of Ford vehicles, that the Class Vehicles were safe, durable, warranted, and reliable Vehicles and concealed the information in order to prevent harm to Ford and its products' reputations in the marketplace and to prevent buyers and lessees from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to buyers and lessees, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in their decisions to purchase or lease the Class Vehicles.

164.    Ford had a duty to disclose the Flex Disc Defect in the Class Vehicles because it was known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members.

165.    Ford also had a duty to disclose because it made many general affirmative representations about the safety, quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual safety, quality, comfort, and usability.

166.    Even when faced with complaints regarding the Defect, Ford misled and concealed the true cause of the symptoms complained of, until the Recall. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the Defect was complained of to Ford.

167.    The omitted and concealed facts were material because they directly impact the safety, value, and usability of the Class Vehicles purchased or leased by Plaintiff and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a buyer or lessee.

168.    Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

1357416.5

a.      *Who*: Ford actively concealed the Defect from Plaintiff and Class Members while simultaneously touting the safety and durability of the Class Vehicles, as alleged above. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Ford responsible for such decisions.

b.      *What*: Ford knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged above. Ford concealed the Defect while making representations about the safety, durability, and other attributes of the Class Vehicles, as specified above.

c.      *When*: Ford concealed material information regarding the Defect at all times and made representations about the  safety and durability of the Class Vehicles, starting no later than 2014, continuing through the time of sale/lease, and on an ongoing basis, until the announcement of the Recall on June 28, 2017, as alleged above. And when Plaintiff and Class Members brought their Vehicles to Ford complaining of the Defect, Ford denied any knowledge of or responsibility for the Defect, and in many instances, actually blamed the customer for causing the problem.

d.      *Where*: Ford concealed material information regarding the true nature of the Defect in every communication it had with Plaintiff and Class Members and made representations about the safety and durability of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the Defect in the Class Vehicles to anyone outside of Ford, until the Recall was announced. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Ford's website.

e.      *How*: Ford concealed the Defect from Plaintiff and Class Members while making representations about the safety and durability of the Class

Vehicles. Ford actively concealed the truth about the existence and nature of the Defect from Plaintiff and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable buyer or lessee and Ford promised in its marketing materials that Class Vehicles have qualities that they do not have.

        f.      ***Why***: Ford actively concealed material information about the Defect in Class Vehicles while making representations about their safety and durability for the purpose of inducing Plaintiff and Class Members to purchase or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles. Had Ford disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff and Class Members (and reasonable buyers or lessees) would have been aware of it, and would not have bought/leased the Class Vehicles or would have paid less for them.

169.     Ford actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of Plaintiff and Class Members.

170.     Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased Class Vehicles. Plaintiff and Class Members' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

171.     Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Flex Disc Defect that Ford failed to disclose, and paid for repairs and parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the

Class Vehicles, Plaintiff and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

172.    Accordingly, Ford is liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

173.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

174.    Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

175.    Ford has been unjustly enriched by the purchases and leases of the Class Vehicles by Plaintiff and Class Members through Plaintiff and Class Members purchasing/leasing Class Vehicles from Ford and purchasing replacement parts from Ford that Plaintiff and Class Members would not have purchased/leased but for Ford's misconduct alleged above with respect to the Flex Disc Defect.

176.    Plaintiff and Class Members unknowingly conferred a benefit on Ford of which Ford had knowledge, since Ford was aware of the defective nature of the Class Vehicles' flex discs and the resultant catastrophic failure and safety risk, but failed to disclose this knowledge and misled Plaintiff and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

177.    The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Ford to retain the benefit of profits that it unfairly obtained from Plaintiff and Class Members. These profits include the premium price Plaintiff and the Class paid for the Class Vehicles and the cost of the parts bought from Ford used to replace the cracked or failed flex discs and to repair collaterally damaged Vehicle components.

1357416.5

178.    Plaintiff and Class Members, having been damaged by Ford's conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of Ford to their detriment.

## RELIEF REQUESTED

179.    Plaintiff, on behalf of itself and all others similarly situated, requests the Court to enter judgment against Ford, as follows:

a.    an order certifying the proposed Class, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

b.    a declaration that the flex discs in the Class Vehicles are defective;

c.    a declaration that Ford is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

d.    an order enjoining Ford to permanently repair the Class Vehicles so that they no longer possess the Flex Disc Defect, or, if Ford is unable to permanently eliminate the Flex Disc Defect, enjoining Ford to buy back the Class Vehicles;

e.    an award to Plaintiff and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

f.    a declaration that Ford must make full restitution to Plaintiff and Class Members;

g.    an award of attorneys' fees and costs, as allowed by law;

h.    an award of pre-judgment and post-judgment interest, as provided by law;

i.    leave to amend this Complaint to conform to the evidence produced at trial; and

j.    such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

180.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a

trial by jury of any and all issues in this action so triable of right.

Dated: July 21, 2017                    Respectfully submitted,

                                        **JONES WARD PLC**


                                        By:___*s/ Jasper D. Ward IV*_____
                                        Jasper D. Ward IV (KY 92160)
                                        Ashton Rose Smith (KY 96861)
                                        jasper@jonesward.com
                                        ashton@jonesward.com
                                        JONES WARD PLC
                                        1205 E Washington St., Suite 111
                                        Louisville, Kentucky 40206
                                        Telephone:    (502) 882-6000


                                        Jonathan D. Selbin (*pro hac vice* pending)
                                        jselbin@lchb.com
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        275 Battery Street, 29th Floor
                                        San Francisco, CA 94111
                                        Telephone:    (415) 956-1000
                                        Facsimile:    (415) 956-1008


                                        Annika K. Martin (*pro hac vice* pending)
                                        akmartin@lchb.com
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        250 Hudson Street, 8th Floor
                                        New York, NY 10013-1413
                                        Telephone:    (212) 355-9500
                                        Facsimile:    (212) 355-9592


                                        Mark P. Chalos (*pro hac vice* pending)
                                        mchalos@lchb.com
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        One Nashville Place
                                        150 Fourth Avenue, Suite 1650
                                        Nashville, TN  37219-2423
                                        Telephone:    (615) 313-9000
                                        Facsimile:    (615) 313-9965


                                        *Attorneys for Plaintiff and the Proposed Class*

-40-

1357416.5